Our first case this morning is No. 14-509-28, Whole Woman's Health, etc. v. David Lakey, Commissioner of the Texas Department of Health, etc. And our first presenter is Mr. Bogan. I'm looking at the other case. Well, we could switch cases. Anybody have a problem with that? I guess since you're already seated here, we'll go ahead and hear this one first. But everybody in the courtroom is going to have to stay for all three arguments. No? Okay. If you want to leave after the first one, you may leave. Okay, now let's see. It's Jonathan Mitchell. Sorry, Mr. Mitchell. You're ready to argue the first case, not the second one. May it please the Court. Texas enacted House Bill 2 for the purpose of raising the standard of care for abortion patients and to deter and prevent substandard abortion practitioners from offering their services in Texas. The district court enjoined the state's officials from enforcing House Bill 2's requirement that abortions be performed in ambulatory surgical centers, as well as its requirement that doctors performing abortions hold hospital admitting privileges. The district court's judgment is wrong. In working through the record, I had trouble discerning what it is about the ASC that is better than the existing rules prior to House Bill 2 for abortion facilities. In other words, what does improve? I understand the admitting privileges with respect to the doctor himself or herself, but as far as the facility, what is the improvement? There's several improvements in the standard of care from the ASC rules. The first is the enhanced accountability and accountability mechanisms that are provided by the provision in Chapter 125. The physical plant requirement. I'm sorry. I realize there's a lot of rules, so let me be more specific. The evidence that was in the record primarily focused from your opponents on the issue of having to retrofit or expand or make a bigger facility or buy land and build a facility or whatever. So the physical plant, I guess, requirements, what about that improves the standard of care? Physical plant requirements improve the standard of care by ensuring a sterile operating environment. That's what all those rules are designed for. There are other rules that aren't. And why can't you have a sterile operating environment in a 3,000 square foot? They made a big deal about how it has to be 7,000 square feet and all this, and it was a very long discussion. And I was trying to understand what the relationship between these building requirements and the sterility was. Many of the building requirements are established simply to provide a standard for clinics and other ambulatory surgical centers. But wasn't there already a standard for abortion facilities? Yes, there was in Chapter 139. But those requirements did not ensure a sterile operating environment. They also did not ensure some of the other patient protections that are contained in the operating requirements of the ASC rules. Now, you can't go through, not every single ASC rule is specifically designed to be optimal for a particular medical practice or a particular building that's being used. They're designed to create a standard and a uniform rule that can be easily administered by state officials, and more importantly, a uniform rule that can be easily administered by outside monitoring groups that participate in ensuring that the standards are complied with. Why does there need to be a sterile operating room if there's no one to tell us that that's important for this type of procedure because of the bacteria that's already there in the procedure? They say it doesn't need to be sterile. There are some medical personnel who take the view that a sterile operating environment is not necessary, but there are some who are. And when there are disagreements among medical experts, just as there were in the partial birth abortion case, the legislature is entitled to resolve that disagreement. Gonzales against Carhartt is instructive. There was expert testimony from some medical experts that partial birth abortion would be necessary for a patient's health in some circumstances. There were other experts who opined in that trial that no health exception was necessary, and the Supreme Court said in this type of situation where medical opinion among experts diverges, it's the job of the legislature to resolve that, and the court should not second-guess that so long as the disagreement is reasonable. So, Mr. Mitchell, do we defer to the legislature rather than to the finding of the district court, the implied finding that that wasn't medically necessary? The district court should not be resolving disputes among medical experts in abortion litigation because Gonzales against Carhartt says that federal courts are not to serve as the country's ex-officio medical board and to make findings of fact. You know, I mean, and this is the reason that sort of underlayed Daubert and that line of cases is the idea that you can kind of find an expert to say anything. So are we... Rational basis review still requires some degree of review, okay? And so are we saying that if you can find someone in the world to say, we need, you know, marble floors in an abortion clinic, then that would be good enough to allow the legislature to pass that? The mere existence of an opinion is not enough. The opinion must be reasoned, and it must be at least rational to believe that the opinion might be correct. That's the standard on rational basis. But, of course, that's not the only standard that must be satisfied here. All of the dispute about whether ASC laws will provide medical benefits go to whether the law has a rational basis. The undue burden test, by contrast, is concerned with what the effect will be on abortion cases. Let's get on to that because I'm a little bit confused. So even putting aside the issue of purpose, we know the effect has been that at least in West Texas, we no longer have any abortion clinics, whether that was the intent, whatever, whatever, whether that will continue into perpetuity. I mean, we know that's the effect. So we have women driving 150 miles, 200, 500, whatever the number is, a long way. And as I appreciate Dr. Anderson's testimony, if I'm understanding what he's saying, is that the problems stemming from an abortion arise, you know, maybe down the road. And that might be literally down the road. So the woman is driving down the road in West Texas in the middle of nowhere and starts profusely bleeding. Isn't that a problem? Isn't that sort of the antithesis of what the state is trying to promulgate here? Even if we accept all of those factual assertions, that can at most justify as-applied relief limited to El Paso. It cannot conceivably justify the total statewide invalidation of that. But you're opposing the as-applied, as I understand it. We are opposing that. But our first argument is that stational invalidation is not even an issue. You don't have this issue in Dallas. I will agree with you because you have a clinic in Dallas, so, you know, you're not driving around. But I have a concern because accepting your evidence as true, which isn't necessarily the right standard of view, but accepting that, it seems like we're going to have women driving the long way and suddenly have a bleeding episode in truly the middle of nowhere. I mean, you and I both know. West Texas, you can go miles with there not even being a gas station. So how does this protect that woman, this statute? In El Paso, the reason we're opposing as-applied relief in El Paso, there's several reasons, but one is that there are abortion clinics available in Santa Teresa, New Mexico, right across the border, just five minutes across the border. We're talking 10 miles from the existing clinic, both reproductive services and Hilltop that are alleged to have closed. And the Jackson against Currier case that came out of Mississippi has some language that might suggest the court shouldn't consider out-of-state providers. What about McAllen? I mean, I understand the El Paso is a little bit complicated because we have to pretend like it's 550 miles when it's really 10, but tell me about McAllen. Several things with McAllen. First, there's a res judicata issue because they could have sought as-applied relief on the admitting privileges law in the previous lawsuit. But with the ASC requirement, this court held in AVID II that it's not an undue burden to drive from McAllen to Corpus Christi. The only thing that has changed since that holding is that the Corpus Christi clinic, which is not an ASC clinic, will not be in existence if the ASC law goes into effect. So rather than driving from McAllen to Corpus Christi, the patients now must drive from McAllen to San Antonio. So what the plaintiffs must show is that the extra 50 or 100 miles or so from Corpus Christi to San Antonio, making the trip from McAllen, is what tips the balance from not being an undue burden to being an undue burden. You spoke about AVID II. I'm new to this. How does AVID II bind this case in any way, or does it? Well, it binds this panel to the extent of its undue burden analysis, and there's several important holdings from AVID II that control here, one of which is that the undue burden standard is one that looks solely to the effect on abortion patients. It's not a balancing test that asks is the law medically justified and is that justification enough to outweigh or counteract whatever burdens may be imposed on abortion patients. What about the Barnes opinion? There may be certain situations where the state's interest is so compelling that it can trump an alleged right to an abortion. For example, and I think Jackson recognizes this, if there's only one abortion doctor left in a state and that abortion practitioner is someone like Kermit Gosnell, the state can go shut him down. Jackson against Kerber says this at the end of the opinion, even if it means there won't be any providers left in the state. There may be some compelling interest to trump any assertion of a constitutional right. But when it comes to undue burden, a test that was established in Casey, AVID II says that the test is whether a substantial obstacle is imposed on abortion patients, not whether the obstacle has a medical justification. The alleged medical justification goes only to whether the rational basis test is satisfied. The second important holding from AVID II is... My question really was directed to the rational basis, because I understand what AVID II says. I mean, I was on the panel. But if you're saying that, OK, maybe when you pass the bill from the outside, you don't realize the effect, but now that you look at the effect, is it rational to say that the effect of this bill is to advance the medical care of women if you have women driving long distances? And maybe I'm misunderstanding the evidence, but my understanding was these bleeding events can take place after you're literally on the road. The law is designed to improve the standard of care. Is that correct, or am I misunderstanding the evidence? Is it correct that under the HB 2, it could be that a woman goes, she gets her abortion, she's driving this 150 miles, 200, 300, whatever the number is, and has a bleeding event? There's always a risk of that, Judge Haynes, no matter what the driving distance is. There's always a risk of complications that could occur at the clinic... But is that how they typically develop? I understand their argument is there's nothing typical about complications, they don't happen. Your argument is that's underreported, there's always bleeding events, all these emergency rooms that aren't reporting them, and so on. When do these bleeding events occur? We don't have factual data. I'm calling that to cover a lot of things. I don't mean to use a vernacular term, but I'm just trying to cover a constellation of events that occur that are bad following an abortion. Does the record have anything to say about that? No, we don't have evidence in the record on what percentage of complications occur at the clinic versus how many of them occur after the patient's arrived home versus how many of them occur in the car driving to or from the clinic. There's always a risk that a complication could arise, and there's always a risk that a complication could arise during transportation to or from the clinic. But we don't have episodes in the record of that happening, and we don't have evidence of how many times that has happened or how many times it will happen. Mr. Mitchell, is rational basis a subject of this appeal at this time? My understanding is that it's not. Judge Yackel specifically found that the law had a rational basis and was rationally related. But that wasn't appealed. That's my understanding. They have appealed the judgment. Rational basis is not before us, is it? My understanding is that it is not. Now, to cover our basis, Judge Elrod, we're still making clear why the law has a rational basis, and we've explained that in our briefs. The plaintiffs were critical of our reliance on some extra record evidence, but rational basis review is not limited to the record. The question is only whether a rational basis can be imagined. Go ahead. No, I was just going to say, so then, well, I think it's in play. But whether it is or isn't, let's look at your undue burden argument on El Paso. Is it your contention that the Jackson case does not limit the judge's analysis of El Paso where there is a clinic 10 miles away? In other words, that Judge Yackel should have considered the presence of the New Mexico clinic in determining whether as-applied relief in El Paso is appropriate. That is our position, Judge Haynes, and there's language in the Jackson opinion that can be read either broadly or narrowly, and there certainly is some language that couldn't be read to suggest that out-of-state clinics should never be considered, period. But at the very end of the Jackson opinion, the Court says that it's holding us limited to this particular circumstances of this case, circumstances in which all of the in-state abortion providers are being closed down on account of the law, and circumstances in which we don't have a cross-state metropolitan area like we have in El Paso. So our case is distinguishable in several ways from the Jackson situation. Do you lose if we interpret Jackson to mean that you can't consider St. Teresa? Well, we certainly wouldn't lose across the board. Do you lose on El Paso applied? Do you concede El Paso applied based upon 500, over 500 miles, given our precedence, it is looking at miles? I know some of you, Miki, say we shouldn't be looking at the miles, the Eighth Circuit doesn't look at the miles at all, and that there is some language in one of our, and I think in Abbott, that says mileage alone is not, but then we go through a mileage analysis. Right. So do you lose on El Paso? I wouldn't concede that, Judge Elrod. Why not? I would hang my hat on that statement in Abbott, too, that says KC counsels against striking down an abortion regulation solely on the ground. But our precedent does go through these mileage analyses. It does. And it would be inconsistent with our precedent to say, oh, we're not going to do that anymore all of a sudden. I certainly would admit we'd have a harder case if Jackson were read broadly. I wouldn't quite concede that we would lose, and even there, the most on which the plaintiffs could get relief would be an as-applied remedy limited to the clinic in El Paso. Or the physical plant requirement for the ACS. Yes, for the physical plant requirements, because those are severable from the other requirements. Somebody raised a mootness question on El Paso, because it closed anyway, even though the stay has been stayed or whatever. El Paso is free to operate free of the ASC requirements, but closed anyway. We thought it was important to flag that, because the plaintiffs say in their brief that El Paso still has not reopened, even though this law has been enjoined now for three months. And if El Paso has no intentions of reopening, then there shouldn't be an Article III case or controversy between the El Paso Clinic and this Court. Mr. Mitchell, you knew that they didn't have a license, that they had turned in their license even before the trial in this case. We did. So you could have developed a record as to what were the intentions of the clinic in El Paso and whether it depended on that. And that was never raised until now. So why should we be considering that now? Well, first, it's jurisdictional, so it has to be considered regardless. Right, but wasn't it moot already? No, the reason we're raising it now is because, for example, with McAllen, once the remedy came down from the Supreme Court that stayed this Court's... I'm sorry, that vacated this Court's stay of Judge Nagle's decision, McAllen opened right away. El Paso still hasn't opened yet. So it does raise the question, does El Paso have the capacity to reopen, and will it reopen? By trial, all we knew was that El Paso had surrendered its license. But how do we determine that? I mean, in the appellate court, we're not really well-suited to developing facts. Attorneys on both sides have an ethical duty to bring to this Court's attention any facts that might be relevant to a question of mootness. How do we resolve this question of whether El Paso could or might reopen, period? How do we do that? We need to know from the plaintiffs. The plaintiffs need to bring to the Court whatever factual information is relevant on that. And right now, all we have from the plaintiffs is a vague statement that El Paso is taking steps to reopen. We need more. We need to know more details to determine whether there's an Article III case or controversy. I see my time has expired. Do y'all have any more questions? Yes. Yeah. Two and a half minutes? No, three minutes is fine. Have you answered that question? Or are you still answering Judge Haines' question about how we would determine whether it's moot? The way to determine it will be based on factual disclosures presented by the parties, and that both lawyers on both sides have an ethical duty to bring those facts to the Court's attention. Okay. How do we review that? What determines whether it's moot or not? What determines whether it's moot is whether the standard for an Article III case or controversy is satisfied. And that standard requires that it must be likely and not merely speculative that a remedy from this Court will address, redress, the constitutional injury alleged. So what... Go ahead. That's the standard from Bouffant. Now, is it the State's position that distance or mileage alone is not sufficient? That's what Abbott II says. And we would argue that it's hard for a court to simply draw an arbitrary line to say that this number of miles is an undue burden and this number of miles isn't. The undue burden test requires something more than simply driving distances. It must be the type of obstacle, and perhaps Jackson is a good example of this, where everyone has to go out of State. It's not an arbitrary number that's being drawn, but simply the fact that abortion is no longer available in the State. The situation under House Bill 2, even under Clinton's worst-case scenario, is that abortion will still be legal and widely available in Texas. People will have to travel to get abortions, but that's always the case. Everyone has to travel to get to an abortion clinic. And there will be... The vast majority of the State's population will live within 150 miles of an ASC abortion clinic. Can you see any distance being an undue burden? It's a hard question to answer, Judge Prado, because the Supreme Court just hasn't given us a clear line. All the Supreme Court has said is undue burden, substantial obstacle. Those modifiers are very ambiguous. They leave a tremendous amount of play in the joints. And for an appellate court that's bound by the Supreme Court's precedent, and for lawyers who are also bound to respect those decisions, the task of an advocate is to construe these vague terms in a way that is both faithful and consistent with what the Supreme Court says, but also maximizes the State's prerogatives to regulate abortion under the Supreme Court's guidelines. What is the status of any of these, of this issue, the mileage issue, getting to the Supreme Court? The status, as far as we're concerned, is there's nothing on which the Supreme Court has granted certiorari, and the Supreme Court hasn't given any further guidance since Casey. The best authority, I think, to get back to Judge Prado's question is Casey, because Casey upheld a 24-hour waiting period in Pennsylvania, and there was evidence in the record in Pennsylvania that the 24-hour waiting requirement was double driving distances, because it used to be one trip, now two trips are required. And the number of miles that was alleged by the plaintiffs was that hundreds of miles were required for a single trip, and the 24-hour waiting period is double that. So Casey would indicate, as we understand it, that an increase of travel distance of at least a few hundred miles is not an undue burden, because otherwise, the Pennsylvania 24-hour waiting period would have been struck down. But that's the most that anyone, I think, can get out of the Supreme Court's pronouncements. Okay, I have a couple of questions, and the first one is, there's no evidence in the record to support the comments made in the brief about the particular facility and their safety records that you introduced, is there? We should not consider that as part of this record, because that's not really in the record, is it?  Now, the story about the whole woman's health, Beaumont... That was not appropriate to be included in the brief. I was... It was not included in the brief. I respectfully disagree, Judge Elrod, because on rational basis review, the court is not limited to the record. But it's limited to what the legislature would have considered, isn't it, in deciding to do it, and we don't know that the legislature considered this particular article about the Beaumont plan. It just seems like all of a sudden you're throwing that in, and it didn't seem to be part of the record. It's still relevant to rational basis, and all of the... But to me, rational basis isn't even an issue. Well, it might be an issue, and the plaintiffs, because, Judge Elrod, because the plaintiffs have spent so much time in their brief talking about how, in their view, the law is not medically necessary, they're discussing whether the law is rationally related to patient safety. If Your Honor wishes to disregard what we said because Your Honor does not think rational basis is in play, we certainly understand that. But we offered that anecdote to show... Well, we disregard it because it's an anecdote that's not in the record of the case. But anyway, I have a more overriding question. Assuming, arguendo, that Abbott does not prevent the balancing test, that... Just assume, arguendo, that there's nothing in Abbott that prevents balancing, can you win on a balancing test approach? And if so, what would be the balancing test that you would articulate, and how would you work        if there's a feather there, it's not a feather, If there's a feather there, if the interest isn't good enough, that's a significant injury, or is it the nine-socket test where it still requires a significant injury? What balancing test could you win under, and which balancing test would you lose under? We can win under a balancing test because the appellate courts would still be bound by the Supreme Court's pronouncements in Casey and Missouri, which upheld abortion regulations, even though the evidence that these regulations would enhance patient safety was minimal. Consider Missouri. This was a law that required all abortions to be performed by licensed physicians. The plaintiffs in that case produced a study showing that abortions performed by non-physicians were just as safe in the first trimester. The Supreme Court upheld the law. So that means under a balancing standard, a law like the one in Montana that requires abortions to be performed by doctors is one that should be upheld if the undue burden test requires a balancing standard. And our laws are analogous to that. They're laws that ensure proper credentialing of abortion practitioners with admitting privileges, and they're laws that ensure that abortion facilities were... Is the problem really here that Judge Akel didn't do a detailed job of going through each requirement? Because one of the concerns I have is, you know, when you invalidate the whole thing, then you're stuck with the fact that, I mean, some aspect of this law obviously does deal with patient safety, but some of it may be, you know, this whole idea of a 7,000 square foot facility. I still haven't understood why 7,000 square feet is any more or less sterile than 3,000 square feet. But... So, is that the problem? Could he have... If he had been more detailed, would that make your case harder? They'd gone through requirement by requirement instead of just saying the whole thing is... There were a lot of problems with the opinion. That's one of the more egregious problems was this failure to enforce the severability requirement in the regulations. The regulations specifically say each discrete requirement is severable. And the plaintiffs acknowledge that several of the requirements will not impose any undue burdens. To give the most extreme example, one of the ASC rules requires a liquid or soap foam dispenser at every hand-washing facility. That's not an undue burden. And other provisions in the ASC rules are not even alleged to cause clinics to close. Those can't be undue burdens either. So that's one of the problems. The other major problem with his opinion is that he didn't consider the large frame fraction standard, which is the standard this court has established for facial challenges to abortion laws. So there's no way to justify the remedy that he gave, which was a total across-the-board facial invalidation of the ASC rules. What he should have... Has this court established the large fraction test or has the Supreme Court articulated the large fraction test? Neither court has established it. The court, both the Supreme Court and this court, have left the question open of what the standard should be. It is either the large fraction standard or it's the no-set-of-circumstances test from Solano. We're assuming, for the sake of argument, that the most pro-plaintiff standard governs because we win under either one. Assuming there is a multiple-fraction situation, are we talking about everyone in the state of Texas or women in El Paso or women in McAllen? It seems to me we're talking about people in El Paso. That covers every woman as opposed to the state of Texas where the whole state of Texas is not affected by what's affecting women in El Paso or women in McAllen. I think it's different for an applied challenge. The large fraction test is what the courts should consider only when the question is should statewide relief be granted. With the applied challenges, it's a more limited remedy. So the standard for applied is whether undue burdens are being imposed by applying the abortion regulation to this particular abortion clinic. Large fraction test isn't in play there. The large fraction test is what the plaintiffs must meet to get statewide relief. And the bigger problem for the plaintiffs is that all of their claims can be addressed without applied relief. The travel distance grievances against this law can be completely addressed and alleviated by providing applied relief limited to McAllen and El Paso. It cannot in any way justify striking down the application of this law in Austin, Dallas, Fort Worth, Houston, or San Antonio where everyone agrees there will be no more abortions in those cities. So there's no possible basis on which facial invalidation would be appropriate here. Difficult questions for the court are whether as applied relief can issue and what the scope should be and of course whether it's barred by res judicata. The court has no further questions at all. Thank you. Thank you. Ms. Cookie, open up. I think we've probably gone about 10 minutes. I know I gave them five minutes but we went without the clock working so you can assume you have an extra 10 minutes. You have about 30 minutes. You don't have to take it all. Thank you. Good morning. May it please the court, my name is Stephanie and I represent the plaintiff abortion providers. The Texas requirements    of burdensome requirements that will not enhance patient health or safety and are impossible for most abortion providers to meet. The Texas requirements challenge in this case is that abortion providers need to meet. The district court was correct in holding that these laws impose an undue burden on access to abortion in Texas in violation of the due process clause. Is rational basis in play in this appeal or not? Yes, your honor. Rational basis is in play. Even though the district court found a rational basis. The district court concluded in its decision on the defendant's motion to dismiss that there was a rational relationship between some of the requirements and on that basis it dismissed the plaintiff's independent rational basis scrutiny claims. But this court's precedents make clear that in any case concerning an abortion restriction, it's not necessary to include rational basis separately. In fact, it's just part of the analysis that the court both has to consider rational basis scrutiny and it has to be a very clear basis for the court to consider rational basis  And the court has to consider rational basis scrutiny and it has to consider rational basis scrutiny and it has to consider    an  restriction claim. Christie, after the last period of this HB2, we've had women driving these distances and there was testimony about that. Has there been such an occasion using bleeding event and a very broad to cover a broad host of complications, has such a complication occurred on somebody's drive? Is that in the record? What the  is that complications are very rare. And so there is no evidence in the record about complications of that type occurring. But what the record says is that when those kinds of complications do arise, they typically although it's rare, they typically occur after a patient has been discharged from a facility. In the case of medical abortion where the abortion is induced using medication, complications always occur after the patient has left the facility because the medications take time to exert their effect. So the record says that it's typically a week or more after. It wouldn't be on the drive back. It would be a week later. They're already home. In the case of medical abortion, that's correct. And the further that a woman has to travel in order to reach an abortion provider, the less likely she's going to be to return to that community if she experiences a complication. So if a  drive 200 miles to reach the provider, and then a week later she has a complication. But the drive itself is not a risky time. I couldn't really find much in the record on this. I was just trying to figure out how many complications arise. Do they arise in such a time period that the drive is a risky time period? What the record shows is there's a greater risk now than there was before. So whatever the baseline risk may be of having a complication on the drive home, that risk is increased substantially by the increase in driving. But if nobody has these complications on the drive home, then there is no increased risk. This is getting kind of circular. I know there's a lot of people coming in and saying this is a bad idea and we had a lot of evidence on that. But as far as hard evidence of events, is there some? Because I didn't find it. Right. There's not that specific evidence in the record. But what the record shows is that abortion is very safe and complications occur rarely and these requirements will actually increase rather than decrease the risks that women face as a result of abortion. Go ahead. Did you have other, are there other factors that you're arguing for undue burden besides distance? Is that the only thing you have or is there other things that you think are making it difficult for women? Yes, Your Honor. The requirements challenged in this case will have the effect of closing 80 percent of the state's abortion clinics and the rest of  abortion clinics as a result of these requirements. So there is a dramatic reduction both in the number of abortion providers and their geographic distribution. So one source of burden comes from the increased travel distances. Now nearly a million women are going to be more than 150 miles from the nearest clinic but also the decreased overall capacity of the clinics. So the reason I have is you all say this procedure is very short, very simple, very straightforward so it would seem logical that the existing clinics could, if we are just going to go on logic, could absorb the capacity. It didn't seem like there was any actual evidence about whether whatever it is, 70,000 abortions can be performed in seven weeks. First of all, although the surgical procedure itself is short in duration, the patient actually spends quite a significant amount of time at the clinic because prior to the surgery there's the history and physical, there's the ultrasound examination required by Texas law. For women traveling more than 100 miles there's a two hour waiting period. There's also time spent in the recovery room. There are patients that come in for follow-up care. So there are lots of elements of the procedure that are taxing the capacity of the facility besides the actual. So what evidence did you put on that the facilities that do exist cannot handle the increased demand? So the record shows that those facilities collectively would have to increase their capacity by 400 percent in order to meet statewide demand for abortion services. And that in the year following implementation of the admitting privileges requirement the facilities were unable to do that. And in fact there Who said that? Who said they were unable to? Dr. Grossman testified that that actually during that the period following implementation of the admitting privileges requirement when clinics all over the state were closing the ASCs, the number of abortions performed at ASCs actually declined even though there was increasing demand in their communities because other clinics were closing. If in fact How do we know that that's from an increase in demand? Because simultaneously the Texas rate of abortion was going down. And I as I read Dr. Grossman he says that he cannot say in his peer reviewed publication he cannot say that the decrease in abortions is caused causally related to the law. He says that it's correlative that it happened over the same time period but it was already decreasing and he says that he did an observational study and that he cannot say that it was caused. And so if he said I can't say it was caused by the by the increase in demand, then what is the evidence in the record? Dr. Grossman Your Honor, based on the totality of evidence in the record, it was reasonable for Judge Yackel to infer that the closure of more than half of the clinics in the state was responsible for the observed decline in abortion rates. Is this common sense or is there some actual evidence of that in the record? Well, Your Honor, there's I mean the time period is very telling. There's also evidence from the plaintiffs. They testified that they closed some of their clinics as a result of these requirements and but for the requirements they would reopen their clinics. There is also the evidence about the ASC in Fort Worth that was unable to provide abortions at the time of trial because it didn't have a doctor with admitting privileges. So the mere fact that a facility is able to comply with the ASC requirement doesn't mean that it's going to have any capacity at all to provide abortions. That hinges on whether or not there's a doctor available with admitting privileges and the geographic limitation on the admitting privileges requirement limits doctors' ability. That leads me to the Dr. Richter question which I guess is also an as-applied question and so she the evidence about her is that she was told point blank we looked for a way to deny you privileges because you're an abortion provider which is a violation of Texas law that allows a private right of action. If they had instead said we're not going to give you privileges because you're a woman or because of your age or because of your gender or because of your background. I'm very disturbed by the idea that we have to accept something that's a violation of the law over here as a reason why HB2 should be invalidated either as applied or any other way. Well HB2 gives hospitals the authority to veto any doctors' privileges. That's precisely why it's an improper delegation. Why? It doesn't allow because the legislators are legislating against a backdrop of a Texas statute that makes it illegal to deny privileges based on being an abortion provider just as it's illegal if they're a woman or race or religion or whatever. It seems like she's just discriminating against her and therefore HB2 is invalidated. That's what bothers me. If she's being unlawfully discriminated against then that isn't an invalidation of HB2. That's a lawsuit against that hospital as far as I'm concerned. Again, accepting her word and I'm not saying the hospital did that but that's her contention. That's precisely the problem is that discrimination claims of that type are very difficult to prove. It has direct evidence. Somebody told her that. We get discrimination cases all day long about race and religion and gender and so on where there's not that much evidence and they still make it. This person was told this. We looked for a way to deny you rights. Instead of abortion provider substitute woman don't you think she'd have a cause of action there and shouldn't she at least pursue that? She may well pursue that cause of action. Those statements  for clarity not to Dr. Richter herself but to the state inspectors that interviewed the hospital CEO about the status of Dr. Richter's privileges. But the record shows that throughout the state providers were denied privileges for various reasons unrelated to their qualifications or competence. Can you answer the question? Shouldn't she have to pursue that since she has a remedy? Rather than invalidating the HB 2 invalidate the hospital's wrongful conduct if in fact that's what occurred. Assuming this testimony to be correct that that's what was said then that's illegal. So that's what I'm saying. Shouldn't that be the remedy rather than invalidating HB 2? No Your Honor because the record shows that as a whole HB 2 is imposing burdens on doctors that are preventing them from practicing. And even if Dr. Richter were to pursue her remedy and two years down the line or five years down the line get a judgment that then forces the hospital to give her privileges, her patients still have no abortion provider for years at a time. And in other hospitals denied other providers privileges and they weren't as explicit in saying it's because you're an abortion provider but they did say it's not related to your competence but their bylaws allow them to deny privileges to doctors for economic reasons. It's not in the hospital's economic interest to take on this particular physician. It just shows that there's no real nexus between the admitting privileges requirement and the state's efforts to ensure the qualifications of doctors who perform abortions are qualified to do so and the facilities that employ those doctors are responsible for making sure that they're properly qualified. In addition to the regulations of course there's medical malpractice law that serves to ensure that physicians are properly qualified. I'm saying the law doesn't matter because you're not willing to pursue this case against the hospital so maybe patients aren't willing to pursue the medical malpractice. But your honor that's precisely why the chapter 139 regulations give the Texas Department of State Health Services the authority to ensure provider qualifications. In fact the chapter 139 regulations have more stringent requirements in terms of inspection, in terms of quality assurance program, and in terms of penalties for noncompliance than the ASC regulations in chapter 135. I have a question about this, a hypothetical question. You were talking about malpractice and things. Did you know that fewer general practitioner doctors, family practice doctors deliver babies and things now in rural areas because of and I assume they don't perform other gynecological functions because of the malpractice insurance issues that they face, the higher things in rural areas. And we also know that not as many people are going into performing abortions for whatever reason that is, and people are not choosing that as a profession. So there are fewer doctors that are doing this type of procedure. And that's apart from HB2, right? So the question is if El Paso had been successfully using nurse practitioners to perform abortions either medication or surgical abortions and they were having no problems and the perfect safety record and excellent, excellent thing. And the state came along and said no, we really think because we are aware of problems in America elsewhere where people are doing shoddy practices, we think you should have a doctor and we can regulate that better. But you can't find a doctor to be in El Paso because it's hard to find doctors who perform these functions and the doctors are decreasing. We know they are retiring all over the state for reasons. Would that be, would an applied challenge for El Paso be sustained under those facts post-Missouri? Well, Your Honor, in Missouri the Supreme Court specifically held that the physician only requirement would not include any limitation on access to abortion and that's a critical point. The court concluded that only a single provider would be affected and that there were other providers at that same facility who could take on that provider's patient. So the court said that no woman would be forced to travel to another clinic than she otherwise would have in order to be able to receive a physician only requirement with imposing, as you said, a substantial obstacle to abortion access. That would be a tougher question. Since the time of Roe, the Supreme Court has held that abortion may be limited to only licensed physicians, but at the same time in Roe's companion case, Sylvie Bolton, the Supreme Court said that restrictions on the type of facilities in which abortions are performed must be supported by credible medical evidence. And in Sylvie Bolton, the court struck down a hospitalization requirement. Subsequently, in the city of Akron and its companion cases, the court struck down a pair of second trimester hospitalization requirements and it upheld a set of Virginia facility regulations only upon a showing that well, the court explicitly said that the plaintiff wasn't necessarily challenging the health rationale of those regulations, so it had no basis on which to strike them down. But the court makes clear in Casey in the part of the opinion where it discusses the record keeping and reporting requirements, that abortion regulations that are directed towards patient health and safety must be reasonably directed towards the preservation of maternal health. That language originates in Danforth but it's recited in Casey and in fact it's incorporated by reference into Casey and is undoubtedly part of the undue burden standard. In order to uphold any restriction on abortion that  some way and not just de minimis like the regulations at issue in Masaryk, the court has to find that the restriction will actually further some of the unvalid objectives. This is very thoughtful. Your analysis is very thoughtful. But is the answer you don't know whether it would be an undue burden or is the answer that it would be an undue burden or is it the answer that it's not? My hypo. Your Honor, I think it's unclear. I think, you know, the Supreme Court has not addressed this issue since Masaryk. Masaryk was the first case to take on provision only laws under the Supreme Court. And, you know, given the court's sort of consistent upholding up until that point of position only laws, there's reason to believe that the court would uphold such a law. On the other hand, if it actually imposes a substantial obstacle to abortion access, it's possible the court might strike it down. But here, the issue is much more straightforward. Here, we have a set of facilities regulations that are targeted towards physicians, towards licensed physicians, and the facilities in which they operate. Let me ask you about the facility itself. Wouldn't you agree that the district court's order is overbroad because it makes no effort to distinguish between, you know, sanitation stations, liquid soap dispensers, whatever, and this whole 7,000 square foot, you know, facility that we read with all these architects and so on. Wouldn't you agree that there are at least some aspects of this that do not present a problem for existing facilities or anybody else to comply with, and some of them that would involve some degree of retrofitting or finding new facilities or whatever? No, Your Honor. I do not think that the district court's order was invalid because it fails to advance a valid state interest, and because the district court found it was motivated by an improper purpose, it's invalid in all of its applications, and because the statute is invalid, the implementing regulations are necessarily invalid in all of their applications. But even if the court were to reject that theory and were to look just, you know, at the effect of the regulations, the evidence shows that, you know, that various regulations scattered throughout the, you know, these hundred pages of requirements would impose an undue burden on abortion access. But there was no effort to parse that at all, it seemed to me, and the court found a rational basis, so it's not saying, you know, the district court wasn't saying, wow, this whole thing is just completely irrational, there's nothing to parse. So it seems to me that when you're going to have a remedy of invalidating a law statewide, on its face, you have to at least say, you have to at least go through and say, well, the soap dispensers are okay, but the thing about the $7,000 per fee, which I'm not really sure is in the statute, but anyway, we'll spot you that, isn't, you know, and make that kind of detail, that's much harder for an appellate court to say was, you know, go up your hands, the whole thing is out of whack, despite a very strong severability clause. Can you defend that? Yes, Your Honor. The Supreme Court's decision in AOT makes clear that it is not appropriate for a federal district court to engage in rewriting of state law, even when its goal is to try to salvage it. Even when there's a severability clause, you don't think that the court could say, well, I'm going to try and join the X requirement, but not the soap dispenser? I mean, the judge cannot do a partial injunction statute with a severability clause? I mean, then what's the point of a severability clause? Your Honor, there was a severability clause in the parental notification statute at issue in AOT, and the Supreme Court remanded for the lower court to consider what the proper remedy was. Here, in order for the district court to make those kinds of determinations, we would have had to have a two-month long trial to go through and present evidence on each and every requirement to what it could be. There was nothing wrong with y'all doing that, was there? If you thought you needed more time to go through the trial, why wasn't there a two-month long trial? Because the Supreme Court's precedents counsel that it's not appropriate for a federal court to engage in that kind of detailed rewriting of a statute. I mean, the problem is you can't have it both ways. The state is asking, is saying, look, buy its severability clause. I mean, it didn't have to put that in there. It could say we're all in. But they're not. They're saying, you know, we think we've passed the lawful statute, but if the court disagrees, then just invalidate the part that's unlawful, not the whole darn thing. And yet, for convenience, apparently, the court's too busy to take time on this. Is that the argument? No, Your Honor. I was just highlighting one of the practical considerations that underlies the Supreme Court's instructions in AIS. Yes, it was. All the direct testimony was done by affidavit, whatever. I mean, there was plenty of efficiency here. So it seems to me that before you invalidate a statute that Texas spent a lot of time passing, you take the time you need, and whatever that is. And I believe this judge would give you the time you need. I'm not accusing the judge of not being willing to give you the time. I don't find that an excuse. No, absolutely, Your Honor. But Texas also undoubtedly spent a lot of time in enacting its school finance system, and that system of regulations included a severability clause, and the Texas Supreme Court concluded that notwithstanding the severability clause in that international agreement, the Texas Supreme Court also gaveJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJJ Supreme Court provided that they were experiencing a lack of transparency because the provisions were  accessible to the United States and it was woven throughout. This is not woven, these are easily discernible parts. Respectfully, your honor, I disagree with that. The statute says, the court disagrees. The district court did make specific findings and the record contains evidence that at a minimum the physical plant requirements impose an undue burden on abortion access and that all of the requirements that incorporate by reference chapter 20 of the NFPA which is a fire safety code impose undue burdens and are inappropriate for abortion facilities and that the nursing requirements impose an undue burden on abortion   all of the requirements that are in and of themselves and are inappropriate for abortion facilities. I've got two more questions. One has to do with El Paso as applied and I'm wondering whether or not it's appropriate for this court and what is El Paso's intention in the  That's the first question. Okay. Go ahead. I'll take that one, Your Honor. As the record demonstrates and as Marilyn Eldridge testified at trial, the reproductive services absolutely intend to reestablish a clinic in El Paso and is seeking steps to do so. It just recently signed a lease of a new facility and will submit an application for licensure shortly. The reason for the delay isn't because the clinic was dragging its feet or because it wasn't actively working to reopen. But as the record evidence shows, it is not easy for a clinic that has to close down to immediately reopen and particularly not a nonprofit clinic like reproductive services. It had to lay off all of its staff members. It had to let go of the facility lease because it couldn't afford to pay the rent anymore. It had to put all of its equipment in storage and so on.  all that occur? That occurred, I believe, back in April when Dr. Richter lost her temporary admitting privileges and could no longer provide services. So they are ramping up now. With Dr. Richter. With Dr. Richter. That's right. So as applied for the finding the doctor's privileges were enforced, is that Dr. Richter is not going to be a new doctor or something or it might be Dr. Richter. If that person is enforced, how is the ACS keeping El Paso from opening? Right. So what has prevented them from opening to date has just been the logistical hurdles of reestablishing the medical practice, but they have been actively engaged in doing that. It just takes some time. They do intend to do that. So second, the Jackson case relies heavily on gains, which says that you can't export your constitutional obligations. How does that apply where the state of Texas would not be exporting its constitutional obligations and it has a number of clinics open? How would the gain theory of Texas apply? Right, Your Honor. If a woman in El Paso would need to travel 550 miles to reach a Texas abortion provider, that's an undue burden. Texas can't get out from under the undue burden finding by saying we're going to rely on New Mexico to satisfy that woman's constitutional right. Why can't it? Because what says that it can't? Because Jackson relies upon gains to say it's the only one, you can't completely export. Why shouldn't Jackson be limited to it's the only one principle? Because the court in that case specifically says it's not relying solely on the fact that the Mississippi admitting privileges requirement would close the last clinic in the state. Jackson isn't right on the border. The problem that I have with this thing is you've got an injunction that by nature is an equitable remedy. And you are asking us to completely ignore the fact that before HB there was an abortion clinic half a mile over the border in Texarkana but it was Arkansas. We would have to not look at that at all and start making people drive. We know that nobody is going to drive 550 miles. They are going to go to New Mexico. And you are asking us to ignore that based on a case that   remedy. It's important to remember that New Mexico enforces neither an admitting privileges requirement nor an ASC requirement. What the state of Texas is doing is forcing its own abortion providers out of practice because it says these requirements are necessary to advance patient health and safety but it's shuttling patients across the border where those requirements aren't enforced. There's no good reason to force patients to travel to New Mexico to see a doctor that doesn't have admitting privileges. The state of Texas isn't running abortion shuttles. Those patients were already going to New Mexico because it's so close and they have good facilities there and that sort of thing. Isn't that in the record? No, Your Honor. The record shows that those patients were going to reproductive services and the other provider in El Paso to obtain services. The record does not show they were already going to New Mexico to get abortions? No, Your Honor. The record shows that those clinics serve a substantial number of women every year and it wasn't until HB2 forced them to shut down that some women crossed the border. The record doesn't actually show that women were crossing the border at all. It's just a presumption that the state has made. Okay. So that's we've talked a lot about as applied. We haven't talked about facial. And your brief says that the district court was correct in concluding that these requirements will operate as a substantial obstacle to abortion access in a large fraction of the cases in which they are relevant. That's at page 64 of your brief. The district court didn't actually conclude that they will operate as a substantial obstacle to abortion access in a large fraction of the cases. The district court didn't use the term large fraction of the cases, did it? The district court did not use the term large fraction. That's correct. But the district court performed the exact same analysis that the Supreme Court did. Your Honor, in Casey, the Supreme Court did not attempt to calculate a fraction with mathematical precision. Its analysis was qualitative. The court looked to the population of women that would be impacted by the law that would face a meaningful burden and then it discussed whether that burden would be substantial. But does that mean that any large population is automatically going to violate the large fraction test? I mean, is this going to be triggered? Because if you're just looking at the population as a whole and you're not trying to do a fraction of the people for whom the law applies, then big states lose the large fraction test automatically. Is that your point? No, Your Honor. I didn't mean to suggest that. You're certainly looking at the population of women who are affected. So what is the large fraction? What percentage of the women are affected? Well, Your Honor, the district court concluded that a significant number of women who were going to be burdened by the law would be actually deterred from obtaining abortions. And that's the same predicate that the Supreme Court found in Casey to its conclusion that the large fraction test was satisfied. Does the evidence show that the best case for you, taking all the facts, is true, that that percentage is one-fifth or one-sixth of the women? Your Honor, the one-fifth or one-sixth number refers only to the women who would be more than 150 miles away from the nearest clinic. And certainly neither the Supreme Court nor this court has ever created a bright-line rule. Well, how many women are? Is it 80% of the women are affected? Is it 70% of the women in Texas are affected? A hundred percent? First of all, you know, the statute does not satisfy here, right? Your Honor, we agree that the fraction is not a hundred percent. And to satisfy Barnes, you'd have to have a hundred percent, right? Well, if Barnes were applicable, which is our precedent, you'd have to have a hundred percent, right? Well, plaintiffs have certainly argued that the statute has no valid applications because it fails to further a valid objective and it has an improper purpose. So even if that were the standard... I'm talking about our precedent. You know, we're just a lower intermediate court. We're an inferior court. And we're not here to show that there's a valid purpose or serves a state interest. I did ask him some hypotheticals. Maybe our existing precedent doesn't say that. But assume with me that our existing precedent does say that. And our existing precedent requires you to establish that there's a large fraction of women affected. Does this record establish that a large fraction? And what is that fraction? Yes, Your Honor. So there's two things I'd like to say in response. First, just in terms of this court's precedent, there's another Barnes case, Barnes v. Mississippi, 992 Federal 2nd, 1335. At page 1337 of that decision, the court says, quite explicitly, based on the rationale for stare decisis articulated by the Casey plurality, the central holdings of pre-Casey decisions remain intact to the extent not inconsistent with Casey. And so it is part of this court's precedent that Barnes case doesn't apply. So in that way that you're applying it. We've already said that. So we have to go with our previous interpretation of that Barnes case, regardless of what our personal, if we were looking at it fresh, we have to keep in mind    in mind    does not apply to the case itself. So we have to go with our pre-Casey interpretation of that case. And so we have to go with  previous interpretation        go with   interpretation of that case. And so we have to go with our pre-Casey interpretation of that case. Thank you. Thank you very much. Ms. Lisman, you want to do the rebuttal? Okay. Mr. Mitchell, I don't know how much time you have. Let's see where it goes and you tell us when we've asked too many questions. How about now? Can you address that point about the El Paso as applied issue? To me it seems fictional to ignore New Mexico. On the other hand, she makes a good point that why is Texas fobbing off people into a state that has arguably less restrictions if these restrictions are so necessary? Can you address that? I find this a difficult thing to address. Legally I think it turns on how the court reads it. Does the court read it as establishing a per se rule or does the court read it as establishing a contextualized holding? Even contextualized, what she's saying is even if you can consider the availability across the state of New Mexico as necessary to protect the women of Texas, you're now sending the women of Texas to an unprotected place. I don't think it undercuts her argument Judge Haynes because abortion patients have a right to travel across state lines. There's nothing we can do about that. We're simply acknowledging that before the court opens. It's very difficult to defend against it if it's not considered in New Mexico. 550 miles a long way, even in Texas. You're using New Mexico as a defense against the as applied and yet that seems hypocritical as the argument of your opponent. And you haven't really given me an answer to that. I don't see that it's hypocritical at all. We certainly take the view that it's better for abortions to be performed in ambulatory centers. But we can't stop our patients from traveling out of state if they wanted to. But can you use this as a defense against abortions in ambulatory centers? I believe you can. It would be no different from an as applied remedy from this court limited to El Paso. You'll still have a region of the state where there's an abortion provider that's not doing it in El Paso.            can't stop abortions from being performed in ambulatory centers. We can't stop abortions from being performed in  centers. We can't do that. There's a constitutional right to travel. So even if the state wanted to do something about that, we couldn't do that. He said patients are not crossing state lines to go to New Mexico. That's false. He's the doctor who said that. It's clear even before House Bill 2, patients in El Paso were traveling across state lines. The argument is that the driving distance from McAllen  Antonio is no greater than the driving distance from McAllen to Corpus Christi. It is a few more miles, but it's not the type of driving distance from McAllen to Corpus Christi. We don't know what the trip is like in terms of the evidence in the record. We just know what the driving distance is. Casey is very instructive because the 24-hour waiting period in Pennsylvania was upheld. Many rural parts of the state had regions where there were no abortion providers. And hundreds of miles were traveling to abortion clinics. The Supreme Court said that was constitutional. So there is that one holding that's helpful from the Supreme Court on travel distances. That's the only guidance that the appellate court has to go on. And that's what we're relying on. You would be one of the biggest states. Pennsylvania, while it's big, is not as big as Tennessee. Not quite as big. But there were hundreds of miles of driving distance in that case and the Supreme Court upheld it. Should we be concerned and should it cause us to be careful, but by the fact that the Supreme Court vacated our ruling in the preliminary matter. Should that cause the court, does that mean that the court didn't follow its precedent or something like that? I don't think it's a cause for concern at all, because nothing that the Supreme Court did in that decision can prevent the court from following the precedent. The       the state. The Supreme Court did not resolve that when it vacated the state. The Supreme Court did not resolve that when it vacated the  How is the state involved  that? The Supreme Court did not resolve that. The Supreme Court did not resolve that. However, there was a formal petition that was brought to the court. And they vacated the   Wisconsin even though that law had been struck down. But they allowed the Texas law to remain in effect until the end of the year.   allowed the state to remain in effect until the end of the year. And they allowed the state to